Hamil & Co. v. England.

HAMIL & Co., Appellants, v. CHARLES R. ENGLAND, Defendant; WILLIAM MAGEE, Interpleader, Respondent.

Kansas City Court of Appeals, May 30, 1892.

1. **Attorney and Client:** PRIVILEGED COMMUNICATIONS: RULE. If, touching matters that come within the ordinary scope of professional employment, attorneys receive a communication in their professional capacity, either from a client or on his account, and for his benefit in the transaction of his business, or, which amounts ·to the same thing, if they commit to paper in the course of their employment in ¡his behalf matters which they know only through their professional relation to the client, they are not only justified in the holding such matters, but are bound to withhold them, and will not be compelled to disclose the information or produce the papers in any court of law or equity, either as a party or witness.

2. ———: ———: CONCERNING FELONY TO BE COMMITTED NOT PRIVILEGED. It is not within the ordinary scope of professional employment for an attorney to advise or hold professional communication with the intended criminal concerning a felony *yet to be committed*. Therefore, such communications would not be within the protection of the foregoing rule.

3. ———: ———: CONCERNING CHEATING AND DEFRAUDING CREDITORS. Neither will communications be protected which are made while seeking or obtaining professional advice in an attempt to cheat or defraud creditors.

4. ———: FRAUDULENT BILL OF SALE. It was, therefore, *held* that an attorney who advised about and drew up a fraudulent bill of sale could be compelled to testify as to what was said to him by his client.

*Appeal from the Schuyler Circuit Court.*—HON. ANDREW ELLISON, Judge.

REVERSED AND REMANDED.

*A. L. Parsons* and *E. Higbee*, for appellants.

(1) The court erred in excluding the portions of J. J. Parsons' deposition tending to prove that the sale from England to Magee was without consideration, and contrived for the purpose of defrauding England's creditors. The attorney was a party to the fraud, a

co-conspirator. The privileged relation of attorney and client can only exist for lawful and honest purposes. The contrivance of a fraud is no part of the duty of an attorney. To protect such communications would be to foster and encourage fraud; it is contrary to public policy. There is no confidence in fraud. 28 Cent. Law Jour. 541, p. 7, and cases cited; Wharton on Criminal Evidence [9 Ed.] sec. 504, p. 438, and notes 11, 2; Story on Equity Pleadings [9 Ed.] secs. 601, 601a, 602, p. 517; *State v. McChesney*, 16 Mo. App. 259; *Gartside v. Outram*, 26 L. J. Ch. 113, 114, per Lord HATHERLY; TURNER, V. C., in *Russell v. Jackson*, 9 Hare, 392; *Mathews v. Hoagland*, 21 Atl. Rep. 1054; *Cole's Case*, 9 Cent. Law Jour. 81. For illustration of exception to privileged communication between husband and wife, see *Henry v. Sneed*, 99 Mo. 407. If the attorney connived at the fraud, he might be made a party to a creditor's bill, or other action, and compelled to testify. Story on Equity Pleadings [8 Ed.] sec. 232; *Sweet v. Clay*, 49 N. W. Rep. 899. (2) A fraudulent sale of goods is a crime. R: S., sec. 3568. (3) The third clause of section 8925, Revised Statutes, is simply declaratory of the common law (*Cross v. Riggins*, 50 Mo. 335, 336), and ought not to be so construed by reason of the generality of its language as abrogating any of the principles of the common law. The reason of the law is the life of the law. For an illustration of this principle, see *Christian v. Williams*, 35 Mo. App. 297, 302, where the defendant was served with process in literal conformity with the statute, but the service was quashed.

*C. C. Fogle* and *Shelton & Dysart*, for respondent.

(1) The deposition of Parsons was rightly withheld from the jury because by the words of his own

mouth, in this same deposition, he is shown to have been the paid attorney and counsellor of both defendant England and interpleadei Magee, in and about the consummation of the identical transactions involved in this action, and the pretended disclosures made by him in this deposition were of information coming to him solely because of his relation of confidence to these parties as their attorney. Any information coming to him by virtue of this confidential relation or as a sequence thereto, whether written or verbal, through the sense of sight, touch or hearing, is within the privilege, and the court upon the objection of the interpleader rightly ruled that he could not thus lightly trifle with the interests of his client and the honor of his profession. *State v. Davidson*, 90 Mo. 149; *Weinstein v. Reid*, 25 Mo. App. 41; *Woburn v. Henshaw*, 101 Mass. 193, 200. (2) "The great object of the rule seems plainly to require that the entire professional intercourse between client and attorney, whatever it may have consisted in, should be protected by profound secrecy." 1 Greenleaf on Evidence [13 Ed.] 240; *Robson v. Kemp*, 5 Esp. 52. While the seal of professional confidence has never been held to embrace communications made to an attorney with a view to advice, or assistance in the commission of a felony, or other crime which was *malum in se*, yet it does embrace such advice where the crime or offense involved is simply *malum prohibitum*. *Bank v. Merserean*, 3 Barb. Ch. 528, and authorities there cited; Wharton on Criminal Evidence [8 Ed.] 504, last clause. (3) The fact that the charge made on the part of the attaching creditors is that the transaction between England and Magee was merely colorable, not *bona fide*, was fraudulent, and had for the single purpose of enabling England to defraud his creditors, and that the deposition of Parsons tended to

support this contention, does not deprive England and Magee of the protection the law affords them against the perfidy of the unfaithful fellow of whom they have unfortunately sought advice. *Bank v. Merserean, supra; Foster v. Hall,* 12 Pick. 89. Though one seeking counsel pays no fee to one counseled and employs another in the prosecution of the business about which he has sought counsel, yet the client is entitled to the protection of the statute. *Cross v. Riggins,* 50 Mo. 335.

ELLISON, J.—This action was instituted by attachment. Magee interpleaded for the property. He was successful in the trial court, and plaintiffs bring the case here.

Interpleader claimed title through the defendant in the attachment suit, and the plaintiffs sought to prove that the transfer was made by defendant to interpleader to cheat and defraud his creditors, and that interpleader was a party to the fraud. For this purpose he offered the deposition of one Parsons, an attorney-at-law, who counseled and advised with defendant as to the transfer, and who drew up the bill of sale. This testimony, if believed, made out the charge of fraud on defendant's part and connected interpleader with it. The circuit court excluded the deposition on the ground of it being a privileged communication between attorney and client. The propriety of this ruling presents the principal question for our decision.

The rule which makes communications between the client and his attorney privileged, and protects them from disclosure in court, is founded upon motives of public policy. 1 Greenleaf on Evidence, sec. 236. The communications are confidential and the privilege belongs, primarily, to the client, and, unless he waives the privilege, or the communications themselves have been made in a manner or a presence, which robs them

of their confidential nature, the client has the right to seal the mouth of his attorney. We held in *Deuser v. Walkup*, 43 Mo. App. 625, that, where the communication was in the presence of the opposing parties to a settlement about which they afterwards litigated, it was not privileged. Our statute, section 8925, Revised Statutes, 1889, in regard to such communications only declares the common law, and we get no aid from its provisions. The rule as to such communications was stated in a celebrated case written by Lord BROUGHMAN as follows: " If, touching matters that come within the ordinary scope of professional employment, they [attorneys] receive a communication in their professional capacity, either from a client or on his account, and for his benefit in the transaction of his business, or, which amounts to the same thing, if they commit to paper, in the course of their employment on his behalf, matters which they know only through their professional relation to the client, they are not only justified in withholding such matters, but bound to withhold them, and will not be compelled to disclose the information or produce the papers in any court of law or equity, either as a party or as a witness. " This rule was announced in 1833, and has since received the approbation of many English cases. It is quoted and adopted by Greenleaf, volume 1, section 237. An examination of the question, as it has been variously decided before and since the date mentioned, does not show any substantial disagreement as to the rule, but does disclose difficulty in its application, arising altogether, I think, from an application of the meaning of the terms, "ordinary scope of professional employment" and "professional capacity." It is evidently not within the ordinary scope of an attorney's employment to advise, or hold professional communication concerning a felony yet to be committed. He cannot

professionally advise his client as to how he should do. murder. So it is said, that the privilege will not attach to communications concerning the doings of things *mala in se;* and a distinction is taken between such things and those merely *mala prohibita.* But we need not discuss here what things would be *mala in se,* or *mala prohibita,* or whether there ought, logically, to be a distinction; suffice it to say, that advice in the doing, or intended doing of things, conceded to be *mala in se,* ought never to be considered privileged.

But how will this apply to things so low down in the scale of wrong, as cheating creditors? In an early time, Chief Justice HOLT refused to permit an attorney to testify as to a corrupt and illegal agreement which he had drawn between a sheriff and his under-sheriff; such agreement being in violation of a statute against buying and selling offices. The case of *Cormack v. Heathcote,* 4 J. B. Moore, 387, is frequently cited on the side of excluding such communications. It was where an attorney had been applied to, but refused to draw a fraudulent assignment. So, in *Hyde v. M———,* 1 Moll. 450, the deposition of an attorney who had recommended and prepared a fraudulent mortgage for the purpose of evading his client's creditors was suppressed. To the same effect is the case of *Dol v. Harris,* 5 Car. & Pay. 592. There are cases of the same import in this country. *Foster v. Hall,* 12 Pick. 89; *Clay v. Williams,* 2 Mun. 105; *Bank of Utica v. Mersereau,* 3 Barb. Ch. 528, 595–600. In the latter case, the foregoing authorities, and many others, are examined and commented upon; Chancellor WALWORTH, feeling bound by authority, much against his own judgment declared such communications privileged.

Notwithstanding the chancellor's surrender to what he considered was, save in one instance, an unbroken line of authority, such view of the law had never

received, in effect, or in principle, even up to the time of that decision, full acquiescence. But, since the opinion of the chancellor (written in 1848), the question has had much serious consideration. The case of *Follett v. Jeffries*, 1 Sim. (N. S.) 2, recognizes the rule above quoted as announced by Lord BROUGHMAN, but holds that a case of fraud contrived by the client and attorney are not within the rule; "that no court can permit it to be said that the contriving of a fraud can form part of the professional occupation of an attorney or solicitor." In the case of *Russell v. Jackson*, 9 Hare, 387, the vice-chancellor gave utterance to this statement: "Where a solicitor is a party to a fraud, no privilege attaches to a communication with him upon the subject, because the contriving of a fraud is no part of his duty as solicitor; and I think it can as little be said that it is a part of the duty of a solicitor to advise his client as to the means of evading the law." The case of *Gartside v. Outram*, 26 L. J. Ch. 114, did not involve a communication between attorney and client, but one of similar privileged character. In that case Lord HATHERLY makes use of this terse language: "There is no confidence as to the disclosure of iniquity. You cannot make me the confidant of a crime or a fraud, and be entitled to close up my lips upon any secret which you have the audacity to disclose to me relating to any fraudulent intention on your part; such a confidence cannot exist." Referring to the privilege of communication between attorney and client, he adopts as his own this language: "If he is employed as an attorney in any unlawful or wicked act, his duty to the public obliges him to disclose it; no private obligations can dispense with that universal one which lies on every member of society to discover every design which may be formed contrary to the laws of society to destroy the public welfare."

The English law on this subject was as is disclosed in the authorities to which we have referred, when the case of *Queen v. Cox & Railston*, 14 Q. B. L. R. 153, arose in 1884. The case, so far as the question under discussion is concerned, was like the case at bar. There, Cox & Railston were partners under a deed of partnership. One Munster was a judgment creditor of Railston & Co., and issued execution against Railston's goods. The goods were seized under the writ and Cox claimed them by interplea under a bill of sale from Railston. The validity of this bill of sale was the issue. On the trial, the partnership agreement between Cox Railston, bearing an indorsement of dissolution of the partnership prior to Munster's judgment, was introduced by Cox. Afterwards Cox & Railston were tried and convicted for conspiring to defraud Munster, and the case for the prosecution was that the bill of sale was fraudulent, and that the indorsement of dissolution of partnership was fraudulently antedated. On the trial, an attorney was called by the prosecution to prove that, after Munster obtained his judgment, Cox & Railston consulted him as to how they could defeat the judgment, and whether a bill of sale could not be executed by Railston to Cox so as to defeat the judgment; and that at that time no dissolution of partnership had taken place. The testimony was admitted, and the propriety of such admission was reserved. It came up before five of the judges where Lord COLERIDGE, C. J., stated: "We fully recognize the importance of this case, and feel the necessity of protecting all legitimate communications between clients and their legal advisers, and, as the cases are not altogether consistent, we think this case should be argued before a full court, so that an authoritative rule may be laid down."

The case afterwards came up before the court when an able and unanimous opinion was delivered, written

by Stephen, J., in which the testimony given by the solicitor was held not within the protection of the rule excluding privileged communications, and that it was, therefore, properly admitted.

The question arose and was fully discussed in the New Jersey court of chancery in the recent case of *Matthews v. Hoagland,* which is not yet reported. The chancellor in that case gives the case of *Queen v. Cox & Railston* his full indorsement and. approval. He states his understanding of the rule to be (and in that view we coincide) that if the client consults the lawyer with reference to the perpetration of a crime, and they co-operate in effecting it, there is no privilege. If he refuses to be a party to the act, still there is no privilege, because he cannot properly be consulted professionally to aid in the perpetration of a crime, and a case of fraud should fall within the same rule. This view is sanctioned by Wharton's Criminal Evidence, section 504. That there ought not to be any distinction or difference, in principle, between crime and fraud, in the respect of applying a privilege of concealment to either, I have no doubt. Both are the doing, or contriving to do, things *mala in se.* Both are against conscience. That they were regarded as being without distinction in *Queen v. Cox & Railston, supra* (a case of fraud), is seen from the interruption of counsel during the argument. Pollock, B., exclaimed: "Is it possible to contend that if the client's object is to see how to commit a crime there can be privilege?" And Watkin Williams, J., asked: "If a robber consults a skilled lawyer how to rob with impunity, can such a consultation be privileged?" And Stephen, J., in the opinion afterwards delivered, supposes the case of a client proposing to his attorney the forgery of a will. Or falsely personating some other individual and having a will drawn and executed.

Our statute of 1889, section 3568, makes every one a party to the conveyance of goods and chattels for the purpose of defrauding creditors, guilty of a misdemeanor, but I attach no importance to this in determining the question. To cheat or defraud is bad in itself, and does not require the condemnation of statute law to become iniquitous.

I would not be understood as maintaining that the law will protect or extend the privilege of secrecy to only such communication between client and counsel as may be within the confines of the moral code. Nor would I say that the law, in this respect, demands the enforcement of rules based on an excessive refinement of conscience; but rather to withhold the protection of the law from acts which are wrong in the sight of all men, and which find no justification either in the moral or temporal code. Neither have I lost sight of the policy of the law to provide that those accused of crime may have counsel, and that free and unreserved communication may be had between them without fear of disclosure by any legal process. But there is a wide difference between doing, conspiring or contriving a wrong, and in seeking counsel after the wrong is done, which results from the consideration that it is within the ordinary scope of professional duty to defend one whose life or property is in jeopardy— whether the accusation be of matters of crime or positive fraud. The policy of the law requires this, that it may be legally and orderly ascertained whether the accused (in civil or criminal cause) be guilty. Otherwise disorder would prevail and society be overturned. And the books say that the orderly administration of justice and the preservation of the social fabric fathers this policy. If, therefore, all, guilty and innocent alike, were not to be allowed the protection of this privilege, the result would be that the

guilty would not dare communicate with counsel, and trials would only be had of the innocent who are falsely accused, and, therefore, a proper legal ascertainment of the guilt of the guilty much impeded. To say that the guilty, for the reason of being guilty, could not have free and protected communication with counsel, would be next to saying that the guilty should not have a trial.

Doubtless the suggestion will occur, as it did in *Queen v. Cox, supra*, that the rule, as we have interpreted it, will cause difficulty in practical application. That in giving practical application to the rule "the secret must be told in order to see whether it ought to be kept." The court must, however, in this, as in many other instances where evidence is only admissible under certain states of fact or peculiar surroundings, first ascertain whether the proposed evidence will fall within or without the rule. The court will determine the question as it may be influenced by the special facts of each case. The power ought to be cautiously and carefully used so as to defeat any attempt to disclose communications, by subterfuge or false color.

Criticism is made of the instructions given. Taken together, we consider them subject to no substantial objection. Those refused for appellant were properly refused. For the error in suppressing the attorney's deposition, the judgment is reversed and the cause remanded. All concur.